UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 14-23217-CIV-WILLIAMS

EDGARDO G. BONET,

      Plaintiff,

vs.

NOW COURIER, INC., and
ALEXANDER MOLA,

      Defendants.

_____/

### ORDER

**THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment (DE 25, 57, 58), to which Plaintiff filed a response in opposition (DE 64). Also before the Court is Plaintiff's motion for partial summary judgment (DE 56) to which Defendants filed a response in opposition (DE 63). No replies were filed to either of the motions for summary judgment and the time to do so has passed.

## I.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under the governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And any such dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "Where the nonmoving party bears the burden of proof at trial, the moving party may discharge this 'initial responsibility' by showing that there is an absence of evidence to support the nonmoving party's case or by showing that the nonmoving party will be unable to prove its case at trial." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004).

In response, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (internal quotations and citations omitted). The non-moving party "may not rest upon the mere allegations or denials in its pleadings" but instead must present "specific facts showing that there is a genuine issue for trial." *Walker v. Darby*, 911 F.2d 1573, 1576-77 (11th Cir. 1990). Essentially, if the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. *See Anderson*, 477 U.S. at 257. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker*, 911 F.2d at 1577. If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-250.

In evaluating a motion for summary judgment, the Court considers the evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008) (quotation marks and citations omitted).

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, a motion for summary judgment and an opposition thereto shall be accompanied by a statement of material facts, consisting of separately numbered paragraphs, and supported by specific references to the record. *See* Fed. R. Civ. P. 56; Local Rule 56.1. Statements of material facts submitted in opposition to a motion for summary judgment shall correspond with the order and paragraph numbering scheme used by the movant. Local Rule 56.1. If the opposing party wishes to supply additional facts that he believes are material, those facts shall be numbered and placed at the end of the opposing's party's response to the moving party's statement of facts. *Id.* The failure to comply with the Local Rule 56.1 or Rule 56 of the Federal Rules of Civil Procedure will result in the moving party's statement of facts being deemed admitted. *See id.*; *see also* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if

the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it.").

In opposing Defendant's motion for summary judgment, Plaintiff failed to comply with the Local Rules and with Rule 56 of the Federal Rules of Civil Procedure. Plaintiff did not file a proper response to Defendants' statement of material facts, but instead simply recited the same facts Plaintiff proffered in his own motion for summary judgment. (*See* DE 64). Plaintiff's response did not correspond with the order and paragraph scheme used by Defendants and failed to indicate whether the facts offered by Defendants were disputed.[1] Because Plaintiff failed to admit or deny the facts proffered by Defendants with specific citations to the record in the format required by the Federal Rules of Civil Procedure and the Local Rules, the Court may deem Defendants' statement of material facts admitted.

## II.    BACKGROUND

Plaintiff brought his action on August 31, 2014 against Defendants Now Courier and Alex Mola alleging violations of the Fair Labor Standards Act ("FLSA"). (DE 1). Because the complaint was entirely formulaic, consisting of little or no factual allegations regarding the nature of Plaintiff's work, and because the complaint inaccurately cited provisions of the FLSA, the Court granted Defendants' first motion to

---

[1] Plaintiff failed to comply with the Local and Federal Rules throughout this case. For example, although the Court's Scheduling Order cautioned the Parties, in bold, that "[n]otices of unavailability will not be construed as motions to continue or otherwise operate to change the Court's schedule in any way" (DE 33 at 7), Plaintiff's counsel filed a notice of unavailability for September 14, 2015, and September 15, 2015 September 23, 2015, September 28, 2015, September 29, 2015, October 5, 2015, and October 6, 2015, stating that "this Notice shall also serve as a Motion for Protective Order to seek protective relief in the form of acting as an automatic cancellation or agreement to reschedule any matter scheduled to be heard or to occur during the period of absence . . . [and] acts is [sic] seeking relief in the form of a ten (10) day extension of time to respond to any pleading or discovery that becomes due." (DE 48). Likewise, as explained in detail *infra*, Plaintiff willfully disregarded Judge Simonton's discovery Order, and offered no justifiable reason for doing so.

dismiss.  In granting the motion to dismiss, the Court noted that "[i]t appears that Defendants have evidence rebutting every element of Plaintiff's claim, including tax records demonstrating that they did not gross more than $500,000 per year, an affidavit supporting the argument that Defendants were not engaged interstate commerce, and an Independent Contractor & Non-compete Agreement."  (DE 20).

On December 19, 2014, Plaintiff filed an amended complaint alleging that he worked for Defendants as a courier between May 15, 2012 and August 22, 2014. Plaintiff alleged that "[d]uring the first half of the period between on or about May 15, 2012 through on or about August 22, 2014, Plaintiff worked an average of 65 hours a week for Defendants and was paid an average of $11.53 per hour but was never paid the extra half time rate for any hours worked over 40 hours in a week as required by the Fair Labor Standards Act."  (DE 22 ¶ 17).  Plaintiff also alleged that "[d]uring the second half of the period between on or about May 15, 2012 through on or about August 22, 2014, Plaintiff worked an average of 65 hours a week for Defendants and was paid an average of $5.00 per hour after gas and insurance expenses but was never paid the extra half time rate for any hours worked over 40 hours in a week as required by the Fair Labor Standards Act."  (DE 22 ¶ 18).  No explanation was given as to why Plaintiff used different methods for calculating his hourly rate for the two periods, and Plaintiff did not (nor has he ever) disclose the manner in which he calculated those damages or make the documents upon which his calculations are presumably based available for inspection and copying.  *See* Fed. R. Civ. P. 26(a)(1)(A)(iii).

Defendants filed a motion to dismiss the amended complaint (DE 25), which the Court converted into a motion for summary judgment (DE 34).  The Court entered a

scheduling order in this matter (DE 33), which was subsequently amended to extend the time to complete discovery to September 6, 2015 (DE 43).  On September 2, 2015, the Parties appeared before Magistrate Judge Andrea M. Simonton to resolve their outstanding discovery disputes.  At that hearing, Judge Simonton ordered Plaintiff to produce his bank records for 2011 through 2014 by September 16, 2015.  (DE 55).  On September 18, 2015, Defendants filed a second motion to extend the time to complete discovery because Plaintiff had failed to comply with Judge Simonton's Order regarding the 2011-2014 bank records.  (DE 49 ¶ 4).  The Court held a status conference in this matter on September 24, 2015.  At that hearing, Plaintiff conceded that he had not complied with Judge Simonton's order and offered no justification for his failure to do so. Consequently, the Court ordered that Plaintiff comply with his discovery obligations, as well as Judge Simonton's Order, and turn over his bank records by September 28, 2015.  (DE 54).  Because Plaintiff had not timely produced his bank records as required by Judge Simonton's Order, defense counsel did not receive them until September 28, 2015, a mere two days before Plaintiff sat for his deposition.   Having recited the procedural history of this case, the Court turns to the facts adduced through discovery.

### A. Mr. Bonet's Deposition Testimony

1. Testimony Regarding How Plaintiff Found the Position and his Understanding of the Job Requirements

Plaintiff gave the following testimony regarding how he first learned about the courier position with Defendant Now Courier, Inc.:

> Q. Tell me, Mr. Bonet, how did you first learn about Now Courier Inc.?
>
> A. Craigslist.

Q. Okay. What is Craigslist and how did you learn on Craigslist about Now Courier Inc.?

A. Well, I found out about Craigslist through a friend. I was out of work and he showed me the site so I went to the site, I saw the announcement that they were looking for a driver.

Q: So Craigslist is an internet website and you saw an ad on the website announcing a search for the driver; is that what you are saying?

A. No, I have not said that in anyway.

Q. I'm paraphrasing, sir, just to be clear.

A. I'm saying that in no way am I saying that which you are saying.

(DE 58-1, Deposition of Edgardo Bonet, 6:17-7:7).

Mr. Bonet's response to defense counsel's initial questioning would set the tone for his entire deposition.  Defense counsel asked Plaintiff specifically what information the Craigslist advertisement contained, inquiring whether it was "announcing a job for a driver and was there a rate of pay involved?  What is it, what information did you see on the site?" (*Id.* 7:17-20).  Plaintiff refused to answer directly, saying that he only "focused on the telephone number," and did not pay attention to any of the other details.  (*Id.* 7:21:-23).   Plaintiff explained that he saw "this site and there was the announcement, and the telephone number appear there, so what I did was I took the telephone number down and I called Alex Mola over the telephone." (*Id.* 7:11-16).

Plaintiff met with Mr. Mola at a coffee shop where they discussed Plaintiff's "experience driving and the conditions of what I was going to do and what he was going to pay me." (*Id.* 7:24-8:9).  Plaintiff explained that he would be "doing delivery work for 70% of the travel, plus extra" explaining that for "100% for a trip, 70 for me; one hour waiting time, $20.00 for me." (*Id.* 8:10-19).  Plaintiff understood that "all of the expenses

7

were on me . . . maintenance, food, clothes, everything; phone" and that "of course" he would provide his own car. (*Id.* 8:23-9:6). After the discussion regarding the position and its terms, Plaintiff accepted the position and signed an "Independent Contractor and Non-compete Agreement." (*Id.* 8:20-22; 9:7-24).

Plaintiff had worked as a courier driver since 2007 or 2008. (*Id.* 10:18-20). In each of his previous positions as a courier driver, Plaintiff worked as an independent contractor. Prior to working for Defendants, Plaintiff had amassed "a lot" of experience as a courier and was certified by the U.S. Department of Homeland Security and the Transportation Security Administration to access cargo unescorted at airports and seaports. (*Id.* 53-54). Each of his prior employers compensated him "[a]s the companies that work in this area compensate: with a check, a list of the trips, payments for each trip, the percentage that corresponds to me, and the extras." (*Id.* 17:2-10). None of his prior employers deducted taxes from his compensation. (*Id.* 16:5-24).

Based on his experience, Plaintiff understood an independent contractor to be "precisely what Alex Mola and I spoke. . . to work with your own materials – your car that is – insurance, gas, and so forth." (*Id.* 10:21-11:10). Plaintiff affirmed that at the time of the interview he understood he would be an independent contractor:

> Q: When you walked away from that meeting that day did you leave with the understanding you would also be an independent contractor with Alex Mola and Now Courier?
>
> A: Of course. It was not the first time that I was working under these conditions.

(*Id.* 11:11-17).

## 2. Testimony Regarding Plaintiff's Actual Work for Defendants

Plaintiff claimed that while he worked for Defendants he was not able to make his own decisions, was not able to decide whether to accept a trip or not, and was unable to find out what the prices of each trip were. (*Id.* 12:5-9). Plaintiff stated that he "would have to call [Alex Mola] every day at 7:00 a.m. in the morning to let him know that I was ready, I have to call him to let him know that I was at the given place, I did the pickup, I delivered." (*Id.* 14: 13-16). Plaintiff used his phone to record his time and filled out a route sheet. (*Id.* 49:21-50:3). On the route sheet, Plaintiff recorded every trip he made, the pickup, and the delivery, and Plaintiff was paid on the basis of that sheet. (*Id.* 50:3-23). Plaintiff made deliveries in Miami, Fort Lauderdale, and Palm Beach County. (*Id.* 58:9-16). During his deposition, Plaintiff was unable to recount any examples of the types of goods he was transporting. (*See id.* 107:5-20).

Plaintiff initially testified that "of course" he had pickups and deliveries "every single day" and that he "could start working at 7:00 a.m., in the morning and still be working by 8:00 p.m; I could do a pickup on Friday evening and do the delivery on Saturday morning; do a pickup on Saturday to make the delivery on Sunday, and so forth." (*Id.* 14:20-15:1). However, Plaintiff also said there were times when he "was not working over the weekend" but that "[f]rom Monday through Friday" he worked for Defendants. (*Id.* 15:9-13; 49:15-20 [testifying that Plaintiff had a "fixed schedule" from "7:00 a.m. until I finish, Monday through Friday, and many Saturdays and Sundays."]). Plaintiff later clarified that he did not in fact work every single day of the week:

> Q: Sir, was there an assignment available for you every
> single day when you worked for Alex Mola?

A: I don't know what you are referring to with that, because
it's very difficult for one to have something specific that one
has to do when one does deliveries.

Q: Was there a delivery for you to do every single day of the
week?

A: No. No.

Q: Were there days when you called to check in and there
was nothing available?

A: Some days, yes.

(*Id.* 104:11-105:6).  According to Plaintiff, there were weeks when he worked less than

65 hours:

Q: Was there a week that you worked less than 65 hours
that week?

A: Yes. 50 and 60, 45; what can I tell you . . .

***

Q: Sir, the question I asked you was, is there a week that
you worked less than 65 hours a week?

A: I just told you that.  I could have worked 50, 60, 45, never
under 40 – never under 45.

Q: So the amount of hours you worked ranged from 45 hours
to 60 you say?

A: No, you just asked me if there was any time when I
worked under 65.

Q: Were there some weeks that you worked 45 hours for
that week?

A: Many weeks. Many weeks.

Q: And there were some weeks where you may have worked
for only 50 hours that week?

A: 55 and 60, and 65 and more.

(*Id.* 57:9-58:6).

### 3. Plaintiff's Testimony Regarding Other Sources of Income

Plaintiff offered inconsistent testimony regarding whether he earned income from any source other than Defendants during the time he worked for them:

> Q: Are you saying that at no point were you able to earn income from any other source?
>
> A: Oh no, I have not said that. I could have made money from painting a house because I was not working over a weekend, pick up trash, pick up metal, but only when I was not working over the weekend. From Monday through Friday, every day for Alex Mola.
>
> Q: So did you earn any income from any other source during that two-year period?
>
> A: I would not consider that an income for a difference source. Didn't you receive my bank statements?
>
> Q: I'm asking you, sir, if you made monies from any other source during the two-year period that you worked for Alex Mola?
>
> A: No. Another company, no.
>
> Q: Anywhere else, sir, not just a company. Did you do other work, whether for yourself or another company, where you earned additional income?
>
> A: No. No.

(*Id.* 16:14-17:1).

During the time period Plaintiff worked for Mr. Mola he had a checking account and a savings account with Wells Fargo. (*Id.* 63:9-25). Plaintiff had no other bank accounts and deposited his checks and all money he received during the time he worked for Mr. Mola into those two Wells Fargo accounts. (*Id.* 64:1-9). Despite

Plaintiff's repeated assertions that he did not perform any work or receive any money from anyone other than Defendants, Plaintiff's bank accounts reflect a substantial amount of unaccounted for income. During his deposition, Plaintiff asserted that while working for Alex Mola, he was so impoverished that "he had to sell [his] jewelry in order to survive" (*Id.* 65:9-10), and explained, "I could have ... deposited some money in cash that I made somewhere . . . I sold my jewelry or I could have painted a fence, or I could have picked up trash." (*Id.* 65:16-9; 67:9-10). Defense counsel questioned Plaintiff, based on his bank records,[2] about specific deposits in those accounts:

> Q: On March 1st there is a deposit of $17,000.00; do you recall the source of that fund?
>
> A: No, I don't remember.
>
> Q: How about the deposit on March 4th of $1,000.00; do you know where that money came from?
>
> A: No, I don't remember that either. No, I don't remember.
>
> Q: Okay. I will turn to what we'll mark as Defense Exhibit 10. It's a bank statement that has been stipulated to, dated March 12th and April 9th. And for the rest of March, sir – there is a deposit for the sum of $2,363.80; do you recall the source of those funds, sir?
>
> A: Not absolutely.
>
> Q: Was that money, based on your recollection, that was paid to you by Alex Mola?
>
> A: No, I don't remember that either.

---

[2] The Parties stipulated to the admission of the bank records. Despite Plaintiff's remark that "I would really love for the judge, the lady judge or the gentleman judge to give authorization for all the statement that there are at the bank" (DE 58-1, Deposition of Edgardo Bonet, 73:16-18), the Court had, in fact, ordered production of the bank records, and Plaintiff failed to produce them in a timely manner.

(*Id.* 74:16-22).  Counsel continued to ask about specific deposits, identifying dates and times.  For each instance—ranging in amount from $2000 to over $18,000—Plaintiff said he could not remember the transfers. (*See id.* 72-79).

Counsel then asked:

> Q: Sir, you said you only worked for Alex Mola and you only earned income from Alex Mola in the year of 2013. The records reflect that Alex Mola paid you just over $2,000 in October, you have over $7,500.00 deposited in your account in October, is there any explanation for this difference?
>
> A: No.
>
> Q: How would we explain, sir, or how do you explain, where all these monies are coming from when you said your only source of income was through working for Alex Mola?
>
> A: I repeat that I only worked for Alex Mola and that I don't remember.

(*Id.* 85:1-19).

Given the discrepancies between the bank records and Plaintiff's tax returns, counsel asked the Plaintiff to explain:

> Q: Mr. Bonet, Defense Exhibit Number 9, which was your statement from January, 2013, all the way through to Exhibit number 19 which reflects your statement up to 10th January 2014, showed a total deposit of $44,343.00.  Do you know this reflects a significantly different amount than is reflected on your 2013 bank statement – tax return?
>
> A: I don't remember.
>
> Q: You asked me to refer to your bank – your tax return to confirm how much you earned in 2013.  Your tax return, as we went over before –
>
> A: Oh yes.
>
> Q: – indicates $21,793 in income, as was reflected on the 1099.  You also testified earlier that during the entire period

you earned all your income working with Alex Mola. Was the balance between that $21,793 and the total deposits of $44,343.00, income earned by you during the year 2013?

A: That are not in the taxes you mean?

Q: Yes.  The taxes show $21,793 and you had deposits of over $44,400.

A: The taxes show my income.

Q: What do you consider those other monies that were placed in your bank account?

A: I don't remember.

Q: Were they given to you as a gift, sir?

A: I don't remember.

Q: Did you sell an asset to get those monies?

A: I don't remember.  My tax returns reflect only what I made from Now Courier, which was the only company I was working for.

Q: Did you get an inheritance during the year 2013, sir?

A: No, sir.

Q: Did you find some money on the street during the year 2013, sir?

A: No.

Q: So there is no explanation for the difference in the amount you deposited versus what you made from Now Courier?

A: I cannot give you an explanation about something that I do not remember.

(*Id.* 87:21-90:3).

4.  <u>Testimony Regarding Plaintiff's Wages and Expenses</u>

At the end of 2012, 2013, and 2014, Plaintiff received tax forms from Defendants. (*Id.* 19:6-9). Plaintiff's 2012 tax form indicates that he made gross receipt sales of $31,482 and reports that Plaintiff had $22,089 in car and truck expenses, and $5,990 in other expenses. (*Id.* 21-22; 60:1-7). Consequently, Plaintiff reported a net profit of $1,033 for 2012. (*Id.* 22:19-25). With respect to the $22,089 claimed in car and truck expenses, Plaintiff stated he "imagine[s] that these are all the expenses; miles, gasoline, repairs and so forth." (*Id.* 25:7-13). In his 2013 tax return, Plaintiff reported $21,793.40 in income. (*Id.* 33:11-24-34:13). In that return, Plaintiff reported $17,081 in car and truck expenses and $2,357 in other expenses. (*Id.* 34:20-25). For 2013, Plaintiff reported a business loss of $305. (*Id.* 35:1-6). In his 2014 tax return, Plaintiff reported $19,577 in gross receipts or sales from business and $16,555 in car and truck expenses. (*Id.* 36:6-37:21). In addition, Plaintiff claimed $2,858 in other expenses. (*Id.* 37: 22-24). In 2014, Plaintiff reported a total of $144 in business income. (*Id.* 37:25-38:2). During the time he worked with Defendants, Defendants did not pay Plaintiff's gasoline, car maintenance, insurance, or telephone. (*Id.* 12:15-22; 49:8-16).

Plaintiff was not paid a flat sum each paycheck; rather, his paycheck varied from week to week depending on the number of deliveries he made. (*Id.* 59:17-19; 61:1-4). Plaintiff testified that "[i]t's possible" that there were weeks when he made more than minimum wage. (*Id.* 56:3-9). However, in his complaint and throughout his deposition, Plaintiff asserts that he was paid less than the minimum wage in violation of the FLSA. Plaintiff explained how he came to this conclusion:

> Q: How do you determine then that you were paid less than
> the minimum wage as you just testified?

> A: Well, I did some calculations during one 15-day period I made $600. Deduct insurance, deduct gasoline, divided it by a minimum of 80 hours, you come up and see that it is 3.75.

(*Id.* 55:18-23). Defense counsel again asked how Plaintiff calculated his wages:

> Q: Sir, in your lawsuit you claimed that you are owed for a total that reflects that you worked every single day for that period that you sued on. What about those days when you didn't work, why are you claiming them in your lawsuit?
>
> A: Okay, then you can deduct from the lawsuit those 5, 6 days where I did not work during those years.

(*Id.* 106:12-20). Again, counsel inquired:

> Q: Sir, your lawsuit, there was a lawsuit filed under Florida Statute claiming that you were not paid the minimum wage for the entire period that you worked for Alex Mola, and there is a part of our lawsuit which indicates you were paid a total of $11.53 per hour, that's paragraph 17, and that you were not paid the extra overtime rate; and another part of your lawsuit which claims after expenses you only got $5.00 and were not paid the extra rate. I want to clarify, sir, what was the calculation of the amount you were, in fact, paid?
>
> A: You have to take a piece of paper and a pencil and do the calculations from the papers that you have from me there. Calculate the miles and the gas and see how was per gallon and then you will find out how much it was only in gas.
>
> ***
>
> Q: Sir, in the request for production we asked you to turn over records of your insurance payment. Did you ever turn those over, sir?
>
> A: No. I don't have them.
>
> Q: And how did you arrive at – according to your lawsuit, you arrived at the amount that was owed after deducting gas and insurance expenses. How did you determine those? How did you arrive at those insurance expenses?
>
> A: Because I knew what I pay.

16

***

> Q: Sir, I do not know what to calculate because you never provided us with a figure that you paid each month for insurance.  You made a claim in your lawsuit that you were paid a certain amount and after you deducted insurance and gas expenses you came up with $5.00 as the amount paid to you.   We are asking for evidence of those insurance payments.  In request for production, item number 9, sir, we asked for all evidence, receipts, and invoices, showing Plaintiff's payments for motor vehicle insurance for all vehicles owned by Plaintiff during 2012, 2013, 2014.  You never provided that to us, sir, so I'm asking you today, do you know how much you paid for insurance during 2012, 2013, 2014?
>
> A: I don't remember.   First, nobody told me that;[3] and secondly, I don't have them.

(*Id.* 110:19-114:2).

Other than the bank statements (which were not produced in a timely manner), Plaintiff has no evidence and apparently did not keep any receipts evidencing his car and truck expenses, the amount of his insurance (health or vehicle), his car repair costs, payment slips, service records, or gasoline costs during the time he worked for Defendants.  (*Id.* 117:10-118:17).  Because Defendants did not receive any evidence regarding the costs Plaintiff used to calculate his wage, defense counsel asked:

> Q: Sir, I asked for receipts and payment slips, service records, I did not receive any.  I asked for –
>
> A: There is none.

---

[3] The Court is troubled by this response, particularly in light of the difficulties in producing Plaintiff's bank statements.   Plaintiff's answers suggest that counsel failed to inform him of Defendants' discovery requests and efforts to seek responsive information from him, consonant with their obligations under the Federal Rules, the Local Rules, and the Florida Rules of Professional Conduct.

> Q: I asked for receipts, invoices for fuel purchases, I did not receive any.
>
> A:  And you won't receive them either.  You have to make the – you have to calculate that yourself.
>
> Q: Sir, you testified earlier that in some instances you purchased your fuel with cash.  You are directing me to your bank statements –
>
> A: Oh God.
>
> Q: – when you have testified earlier that you did make some purchases with cash.  Those will not be reflected on your bank statements.  We are asking if you retained any additional receipts for gas?
>
> A:  I tell you, go make the calculations.

(*Id.* 120:14-121:4).

The deposition concluded:

> Q: Okay. Sir, in 2013, you claimed every single penny that you made from Now Courier as expenses related to your business, yet you provided us with bank statements which showed numerous personal purchases, so if you have lost $305.00 from your business operations with Now Courier, where did all these – where did the money come from to make these personal purchases?[4]

---

[4] Plaintiff's counsel objected to this line of questioning stating "I'm going to assert the accountant-client privilege," and asserting that he was objecting to "any continued harassment with this line of questions relating to any personal expenses or his opinion or his theory as to any calculation, which actually is based upon an accountancy principle.  The client is a layman and knows nothing about accounting."  Although the Plaintiff may be a layman, he brought this suit, asserting damages in a sum certain, and has never provided an explanation for his assertion that he was not paid his appropriate wages, for his damages calculation, for his unexplained personal expenses, or for his unusual tax returns.  The Court fails to see how questions regarding Plaintiff's personal expenses, which are crucial to his contention that he was not paid appropriate wages once his costs are deducted, constitute harassment or are outside of Plaintiff's knowledge.  Moreover, when a party has brought suit, the proof of which will require that privileged matter be offered into evidence, the party waives any claim of privilege. *See generally Savino v. Luciano*, 92 So. 2d 817 (Fla. 1957) (addressing the accountant-client privilege and concluding that a party may not rely on a claim of privilege over a document while simultaneously making a claim the proof of which will require the privileged matter to be offered in evidence. In such circumstances, the offering party waives his right to avoid discovery of the matter.); *Coates v. Akerman, Senterfitt*, 940 So. 2d 504 (Fla. 2d DCA 2006) (providing that

A:  That's none of your business.

(*Id.* 126:2-11).

## B. Plaintiff's Affidavit

Following his deposition, Plaintiff submitted an affidavit (dated the same day his

motion for summary judgment was filed), stating that he "worked for Defendants Now

Courier Inc. and Alex Mola as a delivery driver, from on or about May 15, 2012, through

on or about August 22, 2014." (DE 56-1 ¶ 1).  Plaintiff attested that he "worked day in

and day out in a job which required no special skill set," and that he worked "Monday

through to and including Friday from approximately 7:00 a.m. through to approximately

8:00 p.m. (occasionally in excess of said hours), as well as occasionally on Saturdays

and Sundays.  Thus, I worked approximately 65 hours per week." (DE 56-1 ¶ 5).[5]

Plaintiff further averred that:

> Upon analysis of my weekly pay stubs, I was not paid the
> correct overtime wage for the hours I worked over 40 during
> my employment with Defendants. From on or about May 15,
> 2012 through on or about July 2, 2013, I was paid by
> Defendants approximately an average of $11.53 per hour,
> without deducting expenses. I was required to pay out of my
> pocket my own expenses including gas/diesel, tires, wear-

---

attorney-client privilege is waived "when a party raises a claim that will necessarily require proof
by way of a privileged communication. ... if proof of the claim would require evidence of the
privileged matter, the privileged matter is discoverable."). And, more crucially, it is axiomatic
that documents and evidence, such as those regarding Plaintiff's purported personal expenses,
do not become privileged merely because he has sent them to his attorney or accountant.
Consequently, the Court finds that Plaintiff's counsel had no good-faith basis for objecting to this
line of questioning.

[5] Plaintiff also alleges that "Defendants did not maintain any time records to reflect the hours I
was working for them." (DE 56-1 ¶ 5).  It is unclear whether Plaintiff has actual knowledge
regarding this assertion or if it is based on information and belief.  The Court notes that Plaintiff
testified at deposition that he completed route logs for the Defendants (although those logs have
not been presented to the Court), and that Defendants have produced pay stubs for Plaintiff for
the entire period of his employment.  In addition, although Plaintiff apparently kept logs or
notebooks regarding his employment with Now Courier, (*See* DE 55 at 3), no evidence
regarding those notebooks has been presented to the Court.

and-tear on my vehicle, tolls, license plate renewal, commercial car insurance, and more. I was never reimbursed by Defendants for these costs. From on or about July 2, 2013 through the end of my employment on or about August 22, 2014, I was paid approximately an average of $5.00 per hour after deducting expenses, which is less than both the applicable Federal minimum wages and applicable Florida minimum wages during this time period.

(DE 56-1 ¶ 6). Plaintiff did not explain how he calculated his rate of pay to be either $11.53 per hour or $5.00 per hour. As he had stated in his deposition, Plaintiff asserted that he was required to work full time for Defendants, that he was not allowed to work for anyone else, and that he had no other job while employed by the Defendants. (DE 56-1 ¶ 11). Consequently, Plaintiff concludes that he "was completely economically dependent on the Defendants for my livelihood. I did not have any of my own independent customers separate from Now Courier, Inc. for whom I performed courier services." (DE 56-1 ¶ 11).

### C. The Craigslist Ad, Employment Contract & Proof of Wages

Plaintiff responded to an on Craigslist seeking "Drive w/cargo van & Box Truck (tri-county)." (DE 25-1). The ad stated that "Logistic company needs English speaking driver with cargo van or box truck for on demand and route  compensation 65-70 deliveries in tri-county area valid DL and insurance." (DE 25-1). In April of 2012, Plaintiff signed an "Independent Contractor & Non-Compete Agreement" with Defendants. (DE 25-2). That agreement provided that Plaintiff was hired "under Independent Contractor status and as such [Now Courier] will remit contracted amounts without regard to Federal or State tax withholding, unemployment tax or social security remittances." (DE 25-2).

Mr. Mola submitted an affidavit attesting that Now Courier is a "small company engaged in assisting local customers to move packages and articles around the local community." (DE 25-9 ¶ 1).[6]  Now Courier does "not buy, sell or trade anything during the course of our business." (*Id.* ¶ 2).  Mr. Mola stated that Plaintiff "was engaged as an independent contractor who delivered packages when he was called or would check in occasionally to see if there was any deliveries available.   Plaintiff was free to engage in other activities throughout the day and was never waiting at defendant Now Courier's premises or being supervised by any of the defendants." (*Id.*).

Defendants also produced a log showing each check Defendants issued to Plaintiff, the date of the payment, the check number, and the amount of the check.  (DE 57-2 at 1-3).  The log shows that between April 3, 2012 and August 25, 2014, Defendants paid Plaintiff $69,617.07. Defendants also provided copies of Plaintiff's 1099 forms, showing that in 2012 Defendants paid Plaintiff $26,101.65, in 2013 they paid Plaintiff $21,793.40, and that in 2014 they paid Plaintiff $19,556.57. (*Id.* at 5-9).

## III.   ANALYSIS

The FLSA's protections only extend to employees, not independent contractors. *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013).  Under the FLSA, an employer is required to pay overtime compensation if the employee can establish enterprise coverage or individual coverage. *Thorne v. All Restoration Servs., Inc.*, 448 F.3d 1264, 1265-66 (11th Cir. 2006).  An employer is subject to enterprise coverage under the FLSA if, *inter alia*, the employer has an annual gross volume of sales made or business done of at least $500,000.  29 U.S.C. § 203(s)(1)(A). For individual coverage to apply under the FLSA, the plaintiff must establish that he was (1) engaged in

---

[6] Although it appears he was deposed, neither party submitted a copy of Mr. Mola's deposition.

commerce or (2) engaged in the production of goods for commerce.  *See* 29 U.S.C. § 207(a)(1); *Thorne*, 448 F.3d at 1266.  For an employee to be "engaged in commerce" under the FLSA, he must be "directly participating in the actual movement of persons or things in interstate commerce by (i) working for an instrumentality of interstate commerce, *e.g.,* transportation or communication industry employees, or (ii) by regularly using the instrumentalities of interstate commerce in his work, *e.g.,* regular and recurrent use of interstate telephone, telegraph, mails, or travel."  *Thorne,* 448 F.3d at 1266.  Once an employee has established either enterprise or individual coverage, he must also demonstrate that he was not properly compensated for the hours he worked.

### A. Independent Contractor or Employee

To determine whether an individual falls into the category of an "employee" covered by the FLSA or an "independent contractor" exempted from FLSA coverage, the Court applies the "economic reality" test.  *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013).  The Court considers a variety of factors in applying the economic reality test including:

(1)     the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
(2)     the alleged employee's opportunity for profit or loss depending upon his managerial skill;
(3)     the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
(4)     whether the service rendered requires a special skill;
(5)     the degree of permanency and duration of the working relationship;
(6)     the extent to which the service rendered is an integral part of the alleged employer's business.

*Id.* at 1312.  These six factors are not exclusive and no one single factor is dominant; rather, "the overarching focus of the inquiry is economic dependence." *Id.*

A review of each of these factors and the record as a whole reveals that issues of material fact remain regarding whether Plaintiff was an independent contractor or an employee.  Although the label put on the relationship by the Parties is not controlling, *see id.*, the Court notes that both Plaintiff and Mr. Mola understood that Plaintiff was an independent contractor and that Plaintiff had extensive experience working as an independent contractor in the past.  Moreover, the record is undisputed that Plaintiff provided his own equipment and materials during the time he worked for Defendants and that he has substantial experience as a courier, including specialized training and certificates to make pickups and deliveries at secure locations.  The Court also notes that the record evidence in this case, particularly Plaintiff's bank statements, severely undermines his assertion that he earned no income from any source other than Defendants.   These factors strongly suggest that Plaintiff was an independent contractor and not a covered employee.

However, questions of material fact exist regarding the nature and degree of Defendant's control over Plaintiff, his ability for profit or loss depending on his own skill, and whether he was economically dependent on Defendants. For example, while Plaintiff testified that he was not allowed to work for anyone else, Mr. Mola averred that Plaintiff was "free to engage in other activities throughout the day and was never waiting at defendant Now Courier's premises or being supervised by any of the defendants." (DE 25-9 ¶ 1).  Likewise, issues of material fact exist regarding whether Plaintiff was required to call in everyday at a specific time, whether he was free to turn down jobs, and whether he earned money from other sources or was dependent on Defendants for his livelihood.  Consequently, the Court finds that questions of fact remain regarding

whether Plaintiff is a covered employee under the FLSA and the motions for summary judgment should be denied.

### B. Enterprise Coverage

Defendants have produced tax returns and an affidavit from Alex Mola demonstrating that Now Courier's annual gross receipts never exceeded $500,000. (*See* DE 57-3; DE 25-5; 25-6; 25-7; 25-8; 25-9).  Plaintiff has not offered any competent evidence to raise a genuine issue of material fact as to the annual gross volume of sales done by Now Courier.  Consequently, the Court **GRANTS** Defendant's motion for summary judgment as it relates to enterprise coverage.

## IV.    CONCLUSION

The Court has serious concerns about Plaintiff's candor, his refusal to provide an explanation (or supporting documentation) regarding his damages calculation, and his inconsistent testimony regarding his substantial and unexplained income.  However, the Court is constrained in ruling on the instant motions and may not make credibility determinations in reaching a decision.[7]  It should be understood that at trial, unlike at his deposition, Plaintiff will answer, in accordance with the Federal Rules of Civil Procedure and the Federal Rules of Evidence, the questions posed by defense counsel, particularly proper questions regarding his tax records, bank statements, and how Plaintiff calculated his hourly wage.  Moreover, since Plaintiff did not produce his bank records in a timely fashion, defense counsel will be afforded sufficient time and latitude to cross-examine Plaintiff with regard to these records.

---

[7] Although no motion for sanctions has been filed with regard to plaintiff's failure to comply with orders of this Court and the rules of discovery, the Court nonetheless finds, pursuant to its inherent authority, that sanctions are appropriate for the misconduct of Plaintiff and his counsel at Plaintiff's deposition.  The Court will address the appropriate sanctions at the conclusion of this case.

For the foregoing reasons, Defendant's motion for summary judgment (DE 25) is **GRANTED IN PART AND DENIED IN PART**. Plaintiff's motion for summary judgment (DE 56) is **DENIED**. This matter is **SET FOR TRIAL** on July 25, 2016. Calendar call will be held at **11:00 a.m.** on **July 19, 2016.**

The Parties shall adhere to the following schedule:

| | |
|---|---|
| June 14, 2016 | The Parties shall file their deposition designations. |
| June 15, 2016 | The Parties shall file witness and exhibit lists. The witness list shall include only those witnesses the Parties actually intend to call at trial and shall include a brief synopsis of their testimony, the exhibits that the Parties intend to introduce through each witness, and the Parties' estimate of time needed for direct and cross examination. The exhibit lists shall identify each witness that will introduce each exhibit. |
| June 16, 2016 | The Parties shall file a joint pre-trial stipulation, as required by Local Rule 16.1(e) and final proposed jury instructions. Joint proposed jury instructions or conclusions of law (for non-jury trials) shall outline: 1) the legal elements of Plaintiff's claims, including damages; and 2) the legal elements of the defenses |

that are raised.   The Parties shall file all motions *in limine*.

The Parties shall submit proposed jury instructions jointly, though they need not agree on each and every instruction.   If the Parties do not agree on a proposed instruction, the language proposed by plaintiff shall be underlined and the language proposed by defendant shall be italicized. Every instruction must be supported by a citation of authority.   The Parties shall use the Eleventh Circuit Pattern Jury Instruction for Civil Cases, including the directions to counsel.   If a deviation from the Pattern is requested, the parties shall specifically provide a citation of authority supporting the deviation.   The Parties shall submit their proposed instructions via email to chambers at Williams@flsd.uscourts.gov.

Deposition Designations: For each unavailable witness, the Parties shall confer and submit a joint deposition designation.   The party offering the testimony shall select a color and highlight the pages and lines which they wish to introduce.   The non-introducing party shall then underline in red the portions of the designated testimony objected to and in the margins indicate the basis for the objection (*i.e.*, irrelevant, hearsay, etc.).   The non-introducing party shall also select a color and submit to the Court those additional pages and lines that they deem counter designated.   In turn, the introducing party shall underline in red the portions of the counter-designated testimony objected to and indicate in the margins the basis for their objection.

**NO EXTENSIONS SHALL BE GRANTED.**

**DONE AND ORDERED** in chambers in Miami, Florida, this ____ day of June, 2016.

_____
KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE