UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 14-23217-CIV-WILLIAMS

EDGARDO G. BONET,

      Plaintiff,

vs.

NOW COURIER, INC., and
ALEXANDER MOLA,

      Defendants.

_____/

## ORDER

**THIS MATTER** is before the Court following a jury trial held on August 1 through August 3, 2016. At the conclusion of Plaintiff Edgardo Bonet's case, Defendants Alexander Mola and Now Courier, Inc. moved *ore tenus* for a directed verdict under Federal Rule of Civil Procedure 50. Defendants also made an *ore tenus* request for dismissal under Federal Rule of Civil Procedure 41 based on Plaintiff's misconduct throughout this litigation. For the reasons stated on the record at trial on August 3, 2016 and discussed further below, the Court granted Defendants' motions. This order follows.

## I. BACKGROUND

The central facts and procedural history of this case are well known by the Parties and have been comprehensively set out in numerous prior orders by the Court. (*See, e.g.*, DE 20, DE 75, DE 101). Plaintiff initiated this case on August 31, 2014 against Defendants Now Courier, Inc. and Alexander Mola alleging violations of the Fair Labor Standards Act ("FLSA") under both the minimum wage and overtime provisions of

the statute.  (DE 1).  Defendants were served on September 11, 2014 (DE 7), and filed

an answer (DE 8) on September 30, 2014.  In their answer, Defendants denied

Plaintiff's allegations and stated that Plaintiff was an independent contractor and not an

employee, making him ineligible for relief under the FLSA.  The following day, Plaintiff

moved to strike Defendants' answer (DE 9) because it was filed *pro se* on behalf of a

corporate defendant (Now Courier) as well as an individual defendant (Alexander Mola).

In response, the Court entered an order (DE 10) instructing the corporate defendant to

retain counsel and file an answer to the complaint by October 31, 2014.

On October 31, 2014, Defendants, now represented by counsel, filed a motion to

dismiss for failure to state a claim, which the Court granted.  (DE 12, DE 20).  Plaintiff

then filed an amended complaint (DE 22) on December 19, 2014 and Defendants again

moved to dismiss.  (DE 25).  The Court converted the second motion to dismiss into a

motion for summary judgment (DE 34), and Plaintiff cross-moved for partial summary

judgment (DE 56).[1]  On June 1, 2016, the Court issued an order (DE 75) which granted

summary judgment on the issue of enterprise coverage, but held that, despite a number

---

[1] As more fully laid out in the Court's July 26, 2016 order (DE 101), Plaintiff raised procedural objections in a footnote to the joint pretrial stipulation (DE 82)—filed on June 16, 2016—regarding the sufficiency of Defendants' answer in this case.  Plaintiff then moved, on July 22, 2016, to preclude Defendants from arguing that Plaintiff was an independent contractor at trial because of their failure to file a formal answer to Plaintiff's amended complaint.  (DE 98).  The same day, Defendants moved to file an answer out of time.  (DE 97).  The Court denied both Parties' requests.  The Court found that Plaintiff had suffered no prejudice from the alleged procedural defect—briefed only a week before trial—since both Parties were "on full and fair notice of the central issues of fact in this litigation" and "had ample opportunity to develop the record on each of th[os]e outstanding issues." (DE 101 at 4).  *See Hargett v. Valley Fed. Sav. Bank*, 60 F.3d 754, 763 (11th Cir. 1995)(finding that permitting amendment four days before a pretrial conference was not an abuse of discretion because opposing party had been on notice of the challenge since the initial stages of the litigation); 5 Charles Alan Wright & Arthur R. Miller Federal Practice and Procedure § 1286 (3d ed. 2016) ("[o]ne of the most important objectives of the federal rules . . . [is] that lawsuits should be determined on their merits and according to the dictates of justice, rather than in terms of whether or not the averments in the paper pleadings have been artfully or inartfully drawn").

of strong indications that Plaintiff was an independent contractor, "[a] review of each of the[] [relevant] factors and the record as a whole reveals that issues of material fact remain regarding whether Plaintiff was an independent contractor or an employee."

On July 25, 2016—again, a week before trial was set to begin—Plaintiff filed a notice informing the Court that he no longer intended to pursue any of his minimum wage claims and wished to proceed only on his overtime claims. (DE 99). On Monday, August 1, 2016, a jury was selected and trial began on the remaining overtime claim. In light of the Court's grant of summary judgment on the question of enterprise coverage and Plaintiff's decision on the eve of trial to proceed only on his overtime claims, Plaintiff's recovery was contingent upon proving at trial that he was (1) a covered employee under the Act, (2) engaged in commerce or in the production of goods for commerce, (3) who has worked more than forty hours in a workweek, and (4) has not been paid the overtime wages due to him under the Act. 29 U.S.C. § 207.

During trial on August 2 and August 3, 2016 Defendants made two *ore tenus* motions for dismissal under Rule 41 and Rule 50 of the Federal Rules of Civil Procedure, which the Court granted on August 3, 2016 for the reasons set out below.

## II. SANCTIONS UNDER RULE 41

### A. Legal Standard

Federal Rule of Civil Procedure 41(b) provides that "[i]f the plaintiff fails to prosecute or to comply with the[] [federal] rules or a court order, a defendant may move to dismiss the action or any claim against it." Under this rule, "[t]he district court … has inherent authority to sanction parties for 'violations of procedural rules or court orders,' up to and including dismissals with prejudice." *Perry v. Zinn Petroleum Companies*,

LLC, 495 F. App'x 981, 983 (11th Cir. 2012) (citing *Donaldson v. Clark*, 819 F.2d 1551, 1557 n. 6 (11th Cir.1987); *Betty K Agencies, Ltd. v. M/V Monada*, 432 F.3d 1333, 1337 (11th Cir. 2005)).   Though Courts have cautioned that dismissal of an action as a sanction under Rule 41 is a "sanction of last resort, applicable only in extreme circumstances," such a remedy is warranted when there is "both a clear record of willful conduct and a finding that lesser sanctions are inadequate." *Zocaras v. Castro*, 465 F.3d 479, 483 (11th Cir. 2006) (citing *Goforth v. Owens*, 766 F.2d 1533, 1535 (11th Cir. 1985) and *Betty K Agencies* 432 F.3d at 1339, respectively).

### B. Discussion

Throughout the course of this litigation, Plaintiff's conduct has been an impediment to the judicial process.   As the Court noted on various occasions—both in its orders and on the record—Plaintiff has consistently refused to answer the questions of opposing counsel at depositions, produce relevant documents during discovery, adhere to judicial rulings during trial, and otherwise respect and abide by the rules and orders of this Court.   This conduct continued despite warnings, despite the imposition of lesser sanctions, and despite direct court orders addressing this behavior.

### i. Lack of Candor at Deposition

In the Court's June 1, 2016 order on the Parties' cross motions for summary judgement (DE 75), the Court included a number or troubling excerpts from Plaintiff's deposition testimony.   (*See, e.g.*, DE 75 at 6-7, 12-14, 16-19).   As those excerpts demonstrate, Plaintiff repeatedly refused to respond to defense counsel's questions, giving answers such as "No, I don't remember"; "I don't know"; "that's an absurd question"; "don't you have the [bank] statements"; "come on, why are you asking me the

same questions again? . . . You have a pen, you can write down"; "don't ask me anymore about this"; "oh god"; "I tell you, go make the calculations"; and "that's none of your business."[2]  (*See, e.g.*, Bonet Depo DE 58-1 at 22:16, 21; 23:8, 13, 16; 24:23; 27:6; 27:24; 34:7; 41:12-13, 18-19; 49:8-14; 67:13; 69:25; 75:9; 79:14-86:24; 90:3; 114:2; 120:24; 121:4; *see also* Trial Transcript ("Tr.") (Aug. 3, 2016)).[3]  The order concluded by noting that "[t]he Court has serious concerns about Plaintiff's candor, his refusal to provide an explanation (or supporting documentation) regarding his damages calculation, and his inconsistent testimony regarding his substantial and unexplained income."  (DE 75 at 24).  The order also explicitly stated that "[a]lthough no motion for sanctions has been filed with regard to plaintiff's failure to comply with orders of this Court and the rules of discovery, the Court nonetheless finds, pursuant to its inherent authority, that sanctions are appropriate for the misconduct of Plaintiff and his counsel at Plaintiff's deposition.  The Court will address the appropriate sanctions at the conclusion of this case."  (DE 75 at 24).

### ii. Refusal to Produce Documents During Discovery

In the June 1, 2016 summary judgment order (DE 75), the Court also noted its concern regarding Plaintiff's refusal to produce certain documents in discovery despite numerous orders directing him to do so.  Specifically, Plaintiff failed to timely produce his bank records for 2011-2014, to produce "travel notebooks" that he had purportedly

---

[2] At one point during defense counsel's questioning regarding multiple unexplained multi-thousand dollar deposits, Plaintiff glibly responded, "It must have been a gift from the Holy Kings, the three kings that came on January 6th, because I can't remember."  Deposition of Edgardo Bonet ("Bonet Depo"), DE 58-1 at 86: 22-24.

[3] This Order references trial transcripts, which were obtained from the Court Reporter.  Because the transcripts obtained by the Court were excerpted, pagination and line numbers are not included.  Additionally, non-substantive changes, such as punctuation and capitalization, have been made to the rough transcripts to aid in comprehension.

kept of his work travel during the time period covered by his FLSA claim, and to produce the supporting documentation and receipts underlying the calculations in his 2011-2014 tax returns.

### a. Plaintiff's Delay in Producing the Bank Records

Defendants' first request for production of documents is dated June 17, 2015. In that document, Defendants requested, among other things, "[a]ll bank statements for plaintiff" from 2011-2014. On August 27, 2015, the Parties noticed a discovery hearing before Magistrate Judge Andrea M. Simonton for September 2, 2015. (DE 44, DE 45). In Defendants' notice, counsel indicated that Plaintiff had refused to turn over the requested bank statements, "claiming that the account is closed and defendant should subpoena these accounts from Wells Fargo." (DE 44 at 1). Defendants further informed the Court that "[d]espite a request, no account number has ever being [sic] produced." Id.

At the September 2, 2015 discovery hearing, Plaintiff confirmed that he had not turned over his bank records as requested by Defendants nor had he provided defense counsel with the account number. (See DE 55 at 1-2). Judge Simonton ordered Plaintiff to produce the Wells Fargo bank records for the years 2012-2014 on or before September 16, 2015. (Id. at 2, 3). On September 18, 2015, Defendants filed a second motion to extend the time to complete discovery, indicating that Plaintiff had failed to comply with Judge Simonton's order regarding the 2011-2014 bank records. (DE 49 ¶ 4). The Court granted the extension and set a status conference for September 24, 2015. At that hearing, Plaintiff again conceded that he had not complied with Judge Simonton's order and offered no justification for his failure to do so. Following the

6

hearing, the Court set yet another deadline—September 28, 2016—for Plaintiff to comply with his discovery obligations and the Court's orders by turning over his bank records. (DE 54).   As a result of Plaintiff's willful delay and non-compliance, defense counsel had less than 48 hours to review the bank records prior to Plaintiff's deposition on September 30, 2015.  (*See* Bonet Depo DE 58-1 at 28).

### b.  Plaintiff's Failure to Produce his Travel Notebooks

Defendants' document requests also included "[a]ny time cards, logs, mileage sheets, or other reports showing time spent working on each day" during 2012-2015.  In Defendants' Notice of Hearing, however, defense counsel represented that "during the deposition, Plaintiff produced notebooks purporting to contain all of his logs, mileage and other information he kept related to his work with [N]ow [C]ourier and at times referred to these notes in answering our questions. . . . Plaintiff deposed that he turned over [h]is notes containing logs of mileage, dates and times from 'the first day he started working' to his attorneys. None of these were turned over to the defense."  (DE 44 at 2).

Plaintiff's failure to produce these notebooks was addressed at the September 2, 2016 discovery hearing before Judge Simonton.  As memorialized in Judge Simonton's order (DE 55), at the hearing "Plaintiff's Counsel represented that she believed that all of the notebooks had been produced to the Defendants."  (DE 55 at 3).   Judge Simonton ordered counsel "to meet and confer regarding the production of the notebooks" and directed "Plaintiff to show the notebooks to the Defendant that Plaintiff referred to at his deposition."  (*Id.*).   She further ordered that ". . . on or before September 16, 2015, Plaintiff's counsel shall ensure that all responsive documents that Plaintiff's Counsel represented would be produced, have, in fact, been produced."  (*Id.*).

7

Once again, despite a court order directing Plaintiff to turn over his travel notebooks and his attorney's representation that these documents would be turned over to the Defense, no travel notebooks were ever produced.

### c. Plaintiff's Failure to Produce the Supporting Documentation for his Tax Returns

Also included in Defendants' initial document requests were "[a]ll documents relied upon in filing Plaintiff Tax Returns" and "all documents provided to Plaintiff Accountant to aid in preparation of Plaintiff Tax Returns" from 2011-2014.  No such documents were produced in discovery.  When asked about the required tax documentation, Plaintiff stated at his deposition that he either did not know or did not recall how the figures on his tax return were calculated or what expenses were included in the values listed therein:

> Q: Sir, I am asking you, did your tax return reflect gross receipts for the year 2012 of $31,482?
>
> A: If this is what my attorney handed over to you then it is correct, but I do not remember the amounts.
>
> Q: On this document, sir, which was turned over to us, which has your name and social security number, and is titled Profit or Loss from Business, the form for 2012, it indicates that you have car and truck expenses of $22,089 in line number 9; is that correct?
>
> A: Again, I repeat, I do not remember, but if this is what my attorney furnished to you then it is correct.
>
> Q: On line 27a of the said document it indicates you have other expenses of $5,990; is that correct, sir?
>
> A: I repeat the same, sir. I don't remember, but if this is what my attorney provided to you then it is correct.
>
> Q: And on line 31 it indicates net profit or loss of $1,033 for the year 2012, is that correct, sir?   Line 31 of the said

document indicates net profit and loss of $1,033; is that correct, sir.

A: The same answer.

Q: What is the answer, sir?

A: The one I have repeated three times.

Q: Can you repeat again for us. What is the answer? Is that what your tax returns reflect?

A: I don't remember. I don't remember.

(Bonet Depo DE 58-1 at 22:7-23:8).  Plaintiff gave similar testimony at trial, stating, "I do not know anything about the taxes. . . .  I do not prepare them."[4]  (*See* Tr. (Aug. 2, 2016)).

Defense counsel's questions about specific documents—such as receipts, payment slips, and invoices for fuel purchases—were met with equally uncooperative answers:

Q: Sir, I asked for receipts and payment slips, service records, I did not receive any. I asked for—

A: There is none.

Q: I asked for receipts, invoices for fuel purchases, I did not receive any.

A: And you won't receive them either. You have to make the—you have to calculate that yourself.

(Bonet Depo DE 58-1 at 120:14-20).

---

[4] Not only did Plaintiff state that he had no knowledge about the content of his tax returns, but he also stated that he does not believe that he has to sign his tax returns—in order to make their contents his responsibility under penalty of perjury—before they are filed with the IRS.

### iii.  Conduct During Trial

In light of the conduct described above, the Court explicitly warned Plaintiff in its summary judgment motion that "[i]t should be understood that at trial, unlike at his deposition, Plaintiff will answer, in accordance with the Federal Rules of Civil Procedure and the Federal Rules of Evidence, the questions posed by defense counsel, particularly proper questions regarding his tax records, bank statements, and how Plaintiff calculated his hourly wage." (DE 75 at 24). Despite this and other admonitions by the Court regarding Plaintiff's recalcitrance, Plaintiff continued to demonstrate disregard for the rules and orders of this Court.

#### a.  Plaintiff's Refusal to Candidly Answer Questions on Cross Examination

From the start of defense counsel's cross examination, Plaintiff provided the same evasive answers to defense counsel's questions that had been characteristic of his deposition testimony:

> Q: So your accountant prepared a profit or loss for a sole proprietor for you which indicates $31,482 in gross receipts is that the total income you made for 2012?
>
> A: If it says that there it has to be that.
>
> Q: Since, Mr. Bonet, Mr. Mola only paid you $26,101.65 in 2012, where was the rest of the money earned?
>
> A: Look them up in the taxes they have to be there.
>
> THE COURT: No. Mr. Bonet, Mr. Douglas asks you a question and you answer his question. . . . You need to answer the questions. Mr. Douglas is going to ask you a question again.

\* \* \*

Q: What are some of these specific expenses you have on your car sir?

A: I don't know, everything I took to the accountant.

Q: Your Honor, could you direct the witness to answer my question.

THE COURT: I am not sure exactly. Mr. Bonet, are you testifying that you don't remember any of the items of expenses you told your accountant that were placed on your tax return?

A: No. I am testifying that I don't know anything about how taxes are prepared.

THE COURT: Mr. Bonet, actually that wasn't my question. I think that is as far as we were going to be able to go there. Mr. Douglas, I think you should go on to a different line . . . of questioning.

* * *

Q: Mr. Bonet I am going to ask you specifically about some deposits you made in 2013. In January your first deposit was $250 on January 7th. Is that money you earned from Now Courier?

A: Possibly.

Q: There was another deposit for . . . $300 on January 22nd. Is that another deposit you made from Now Courier?

A: Possibly.

Q: According to the record sir you were paid on March 5th, $1017 by Now Courier. Did you deposit that money?

A: I don't remember.

Q: The next payment Now Courier made was March 18th another $1,063. Did you deposit that money?

A: I don't remember.

(Tr. (Aug. 2, 2016)).

The transcript abounds with similar examples of Plaintiff's refusal to answer questions on cross examination, despite the Court's clear direction in its order (*see* DE 75) about its expectations for Plaintiff's conduct at trial:

> Q: So your testimony, Mr. Bonet, [is that] in 2013 you decided you were an employee, but in 2012 you were still filing your taxes as an independent contractor?
>
> A: All the tax returns—
>
> THE COURT: Mr. Bonet, stop. The answer to that question is yes or no, you can choose either one.
>
> A: Yes.
>
> THE COURT: Okay. Move on, Mr. Douglas.
>
> * * *
>
> Q: I note in the box that says insurance other than health you did not claim any deduction on your 2013 return as you did in 2012. Does that mean you did not have any insurance expenses that year?
>
> PLAINTIFF: (WITNESS SPEAKING IN SPANISH).
>
> THE COURT: No, it is also a yes or no question.
>
> A: Yes, I did have insurance expenses.
>
> THE COURT: Okay.
>
> * * *
>
> Q: The bank statements from 2013 showed deposit[s] totaling over $45,000. That is over twice the amount paid to you by Now Courier.
>
> A: How did you come to that conclusion?
>
> Q: Sir is that a question you are asking me?
>
> THE COURT: I think it is. . . .

Q: This is a composite of your bank statements?

A: What page was the $45,000 deposited?

Q: Sir the amount is shown when we examine all of your bank statements from 2013. Are you aware that you made deposits of approximately $45,000?

A: Well—

THE COURT: Yes or no Mr. Bonet.  Are you aware you made deposits totaling $45,000?

A: No.

THE COURT: Okay.

(Tr. (Aug. 2, 2016)).   Because of these exchanges and the other issues described below, the Court was compelled to send the jury out to remind Plaintiff and counsel of their basic obligations of candor and adherence to the rules of court.

### b.  Repeated References to Excluded Evidence

Even more troubling than Plaintiff's general behavior on cross examination was his direct disobedience of the Court's rulings on evidentiary issues.  On July 19, 2016, prior to the start of trial, the Court held a calendar call to address outstanding pretrial issues.  At that hearing, the Court granted Defendants' motion to exclude any mention of the "travel notebooks" that had been ordered produced by Judge Simonton but which Plaintiff had refused to provide to Defendants.  Additionally, on the first day of trial, the Court excluded references to a car accident settlement, after Plaintiff's counsel raised the issue for the first time (after nearly two years of litigation) during his opening

statement.[5]  Counsel were instructed to explain to their client the significance of these rulings.

Notwithstanding unambiguous instruction from the Court (and his counsel)—and the fact that these rulings were a direct consequence of Plaintiff's own actions during discovery—Plaintiff repeatedly referenced the Court's decision to exclude certain evidence and directly testified about evidence that had been excluded in the presence of the jury.   First, Plaintiff testified about the underlying tax documentation that he insisted he did not possess at his deposition:

> Q: . . . I will repeat the question.   On line 15 of your tax return for 2012 sir there is an entry for insurance other than health $2,370 would that be the expense for insuring your vehicle sir?
>
> A: Insurance for my vehicle.  I found the evidence, but I was not allowed to bring it.

(Tr. (Aug. 2, 2016)).   Upon hearing this testimony, the Court excused the jury and issued a stern warning to Plaintiff and his counsel:

> Here's our dilemma . . . .   Despite a Court order, despite a day and a half of hearing in-court instructions, despite—by [Plaintiff Counsel's] own admission—six visits wherein you counseled Mr. Bonet as to how and what he must testify to . . . . Mr. Bonet is unable to answer a single question and has now told the jury the reason why he did not answer the question Mr. Douglas posed was because he had some documents he was never allowed to introduce.  . . . I am, at this point, seriously concerned about this trial and honestly I am not sure at this point what to do so I am going to take a break and have you talk to Mr. Bonet.

---

[5]  In his opening, Plaintiff's counsel proffered this settlement as an explanation for the unidentified funds in Plaintiff's bank account, which directly contradicted Plaintiff's repeated contentions during his deposition that he did not remember the source of any of the thousands of dollars in deposits that did not correspond to payments by Defendants.

(Tr. (Aug. 2, 2016)).  The Court went on to advise Mr. Bonet, "[a]nswer the questions given by the lawyers and do not attempt to introduce matters before this jury that have been ruled inadmissible." (Tr. (Aug. 2, 2016)).

Following a recess, before resuming trial, the Court again reiterated to counsel, that "[t]here should be no answer with, 'but I can't tell you about it' . . . . What Mr. Bonet needs to do is listen to the question and answer it directly." (Tr. (Aug. 2, 2016)). Despite this clear admonition, the following exchange took place shortly after the trial resumed, when discussing Plaintiff's tax returns:

> Q: How did you record [the miles included in the car and truck expenses claimed on your taxes] sir?
>
> A: In my reports—well I don't know whether the Judge is going to allow me to talk about this.

(Tr. (Aug. 2, 2016)).  Again, the Court excused the jury and spoke with counsel.  The Court acknowledged that defense counsel may have opened the door to the admission of Plaintiff's travel notebooks, and allowed counsel to argue that point.  Still, the Court noted that, regardless of the outcome of that evidentiary question, Plaintiff had contravened an instruction given to him by the Court both directly and through his attorneys.  The Court warned Plaintiff of the potential consequences of his actions:

> THE COURT: Mr. Bonet stop, stop. I am going to give you a warning right now.  A direct warning. If you say one more time "I don't know if the Judge will let me," "it hasn't been allowed"—if you say that phrase I am going to sanction you for your conduct.

(Tr. (Aug. 2, 2016)).  With regard to the evidentiary question, the Court ruled, on agreement of counsel, that Plaintiff would be permitted to state that he kept a log and gave that information to his accountants, but nothing more.  The Court specifically

instructed Plaintiff: "Okay. That is all the answer will be. I gave the information to my accountant based on notations I kept about my mileage." (Tr. (Aug. 2, 2016)). The Court then recessed to allow Plaintiff's counsel to explain the import of its ruling to their client.[6]

A few questions later, Plaintiff's obdurate behavior continued. When asked about his bank statements, Plaintiff again raised excluded matters in his testimony, this time relating to the settlement payment for a car accident that had been mentioned by Plaintiff's counsel during opening statements and promptly ruled inadmissible by the Court. Seeing that the prior warnings about lesser sanctions had failed to affect Plaintiff's conduct, the Court addressed the ultimate sanction with Plaintiff:

> THE COURT: Mr. Bonet if you mention that car accident settlement one more time I will dismiss your case. Do you understand me? Yes or no.
>
> PLAINTIFF: Yes.

(Tr. (Aug. 2, 2016)).

---

[6] To avoid any misunderstanding, upon resuming the proceedings, the Court confirmed Plaintiff's understanding of the Court's instruction with both Plaintiff and his counsel:

> THE COURT: So Ms. Sanders will read the last question into the record again. How did you record this and Mr. Sheskin, Ms. Morgado you told Mr. Bonet how to appropriately answer that and Mr. Bonet will move on.
>
> PLAINTIFF'S COUNSEL: And he wrote it down. Let's make sure Mr. Bonet is clear that the answer is he wrote it down.
>
> THE COURT: You understand that?
>
> PLAINTIFF: Yes, I understood.
>
> THE COURT: Very good. Bring in the jury, please.

(Tr. (Aug. 2, 2016)). But these assurances were to no avail. When the jury returned and the question was read back—"How did you record [the miles included in the car and truck expenses claimed on your taxes] sir?"—instead of stating "I wrote it down" as agreed, Plaintiff stated, "[i]n the personal records I have recorded all the miles I have used from the first day to the last day I worked with Alex Mola." Id.

### c. Contradictory Testimony from Other Witnesses

When trial resumed the following day, the Defendants called Plaintiff's accountant—and tax preparer—as their first witness.   Although the accountant had been subpoenaed for deposition, Defendants had been unable to depose her prior to trial.   Consequently, defense counsel asked for permission to *voir dire* the witness prior to her testimony before the jury and the Court granted this request.   During that *voir dire*, Plaintiff's accountant gave the following testimony:

> Q: With respect to 2012 are you saying these four sheets of paper is all you found in your file with regard to the 2012 return you prepared?
>
> A: Yes.
>
> * * *
>
> THE COURT: Did I hear you say Mr. Bonet asked you for your copies back?
>
> A: Several months ago.
>
> * * *
>
> THE COURT: Some months ago Mr. Bonet wanted all the supporting documents to be returned to him. Can you give me a timeframe, more than six months less than six months?
>
> A: More than six months.
>
> THE COURT: And you returned the documents to him—you kept no copies for yourself?
>
> A: Yes.
>
> THE COURT: Did you keep some kind of log as to what documents Mr. Bonet had given you to support let's say his deductions, whatever it is that you would use to make your calculations? Do you know what you gave back to him?

A: I gave back the 1099 forms and his expenses—his insurance the miles that he claimed that he—he didn't bring me anything. He say he has a log book and he brought the numbers already added.

* * *

Q: Do you recall specifically when Mr. Bonet sought to have these documents returned to him?

A: I don't remember.

THE COURT: Was it more than a year ago?

A: Yes, it is about a year.

THE COURT: About a year.

A: Last year around—I think it was July or August.

(Tr. (Aug. 3, 2016)).

These statements directly contradict Plaintiff's repeated assertions that he had given all of the underlying documentation to his accountant and that all questions relating to the manner in which his tax returns were prepared should be directed to her. *See* Section II(B)(ii)(c), *supra.* As the Court noted at trial, the accountant's testimony presents two possible scenarios regarding the tax documentation requested by defense counsel in discovery: Either (i) "[Plaintiff] had asked for all his tax documentation before his deposition . . . [and] his answers—I don't know or ask my accountant—in the best possible light would be misleading, dissembling," or (ii) "[Plaintiff] asked for [the tax documentation] after his deposition knowing they were being sought by opposing counsel." (Tr. (Aug. 3, 2016)). In both scenarios, Plaintiff's conduct evidences, at a minimum, a willful disregard for—and intentional interference with—the discovery

process, the Federal Rules of Civil Procedure, Plaintiff's obligation of candor to the Court, and this Court's orders, generally.

### C. Conclusion

Plaintiff's counsel contends that all of the issues described above were not the result of malice.[7]  Plaintiff blames his failings throughout this litigation on a host of third parties—discovery omissions were the fault of defense counsel and his attorneys, tax inconsistencies were the fault of his accountant, and trial missteps were the fault of this Court and his counsel.  These explanations strain credulity.  To the contrary, Plaintiff's comportment up to and during the trial can only be understood as an effort to obfuscate the issues, flout court orders, and preclude a fair trial on the merits.  As such, the Court finds that, taken together, Plaintiff's actions constitute a willful disregard for the judicial process that was undeterred by warnings and lesser sanctions imposed by the Court.  Accordingly, the Court dismisses this case with prejudice as a sanction under Federal Rule of Civil Procedure 41.

### III. JUDGMENT AS A MATTER OF LAW UNDER RULE 50

### A. Legal Standard

Federal Rule of Civil Procedure 50 provides for judgment as a matter of law on an issue at trial when "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  In ruling on a defendant's motion under this rule the Court "must consider all the evidence in the light most favorable to [the non-moving party], and independently determine whether the facts and

---

[7] The Court notes again that Plaintiff's arguments about "diminished capacity" were raised for the first time on the third day of trial in response to the Court's threat of dismissal as a sanction. As stated on the record, the Court has been presented with no evidence, medical or otherwise, that supports this contention.

inferences point so overwhelmingly in favor of [the moving party] . . . that reasonable people could not arrive at a contrary verdict." See *Bruno v. Monroe Cty.*, No. 07-10117-CIV, 2009 WL 2762641, at *1 (S.D. Fla. Aug. 31, 2009) (quoting *Webb–Edwards v. Orange Cty. Sheriff's Office*, 525 F.3d 1013, 1029 (11th Cir. 2008)) (internal quotation marks and citation omitted).  The Court must rely on the evidence presented at trial in performing this analysis because once "the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary-judgment motion." *Acosta v. James A. Gustino, P.A.*, --- F. App'x ----, 2016 WL 1104025, at *1 (11th Cir. Mar. 22, 2016) (per curiam) (citing *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011)).

For Plaintiff to prevail on his overtime claim under the FLSA, he bears the burden of proving that he was (1) a covered employee under the Act, (2) engaged in commerce or in the production of goods for commerce, (3) who has worked more than forty hours in a workweek, and (4) has not been paid the overtime wages due to him under the Act. 29 U.S.C. § 207.  If any of these elements are not present, Plaintiff cannot recover under the FLSA.  Therefore, in the context of Defendants' Rule 50 motion, if the Court finds that a reasonable jury "would not have a legally sufficient evidentiary basis" to find for the Plaintiff on any of these elements, the Court must direct a verdict for Defendants.

### B. Plaintiff's Failure to Prove he was a Covered Employee

#### i. Background

The overtime provisions of the FLSA only apply to employees.  *See Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013).  Therefore, if Plaintiff fails to prove that he was performing services as an employee and the evidence shows that he was acting in some other capacity—such as an independent contractor capacity—

Plaintiff has failed to prove his claim.  *See* 29 U.S.C. § 203(r)(1)(clarifying that covered activities performed for an "enterprise" do not include "the related activities performed for such enterprise by an independent contractor").

To determine whether an individual is a covered employee under the FLSA, the Court applies the "economic reality" test.  *Scantland*, 721 F.3d at 1311.  The Court's evaluation under this test takes into account a variety of factors, including the alleged employer's control over the manner in which work is performed; the alleged employee's opportunity for profit or loss; the alleged employee's investment in equipment or materials; whether a special skill is required; the nature and duration of the working relationship; and whether the service rendered is an integral part of the alleged employer's business.  *Id.* at 1312.  As the Court noted in its prior order, however, these factors are not exclusive and no one factor is dominant; instead, "the overarching focus of the inquiry is economic dependence."  *Id.*  "Ultimately, in considering economic dependence, the court focuses on whether an individual is 'in business for himself' or is 'dependent upon finding employment in the business of others.'"  *Id.*

The debate about Plaintiff's status has figured prominently in the Parties' motions to dismiss and motions for summary judgment.  Although there was some dispute regarding the proper procedural posture for Defendants' independent contractor defense—namely whether it qualifies as an affirmative defense or simply vitiates Plaintiff's ability to prove an element of the cause of action—the issue is the same: if Plaintiff was an independent contractor or is otherwise not proven to be an employee, Plaintiff's claim fails.  As the Court noted in its order on summary judgment, though the pre-trial record contained evidence that "strongly suggest[ed] that Plaintiff was an

independent contractor and not a covered employee" there were remaining issues of material fact relating to Plaintiff's status that precluded a grant of summary judgment. (DE 75 at 23).  In light of Defendants' *ore tenus* motion for a judgment under Rule 50, the Court is now tasked with evaluating whether the evidence adduced at trial warrants a directed verdict on this issue.  The Court finds that it does.

### ii.  Discussion

Plaintiff's case at trial consisted of the testimony of two witnesses: Defendant Alexander Mola[8] and Plaintiff Edgardo Bonet.  Through these witnesses, the parties introduced a number of exhibits, which included Now Courier's travel logs[9] recording Plaintiff's work for Defendants, the agreement signed between the parties regarding the work to be performed, Plaintiff's tax returns from 2012-2014, and Plaintiff's bank records from 2012-2014.  (*See* DE 106, DE 107). Nearly all of this evidence undermines Plaintiff's contention that he was an employee while working for Defendants.

### a.  Exhibits Introduced at Trial

The exhibits introduced into evidence at trial demonstrate that—in terms of compensation, the characteristics of Plaintiff's work for Defendants, and the terms of Plaintiff's agreement with Defendants when hired—Plaintiff was acting as an independent contractor and not an employee.

---

[8] The Court notes that, at trial, Defendant Mola repeatedly denied ever having any employees and offered no other facts or statements that could support Plaintiff's contention that he was an employee and not an independent contractor. (*See* Tr. (Aug. 1, 2016); Tr. (Aug. 2, 2016)).  As such, Mr. Mola's testimony is not discussed in this Order.

[9] These travel logs are the sheets that Plaintiff submitted to Defendants while working as a driver, which were maintained by Defendants to record Plaintiff's jobs and waiting time.  The travel logs, turned over by Defendants during discovery, are distinct from the travel notebooks that were excluded at trial.

## 1.  Independent Contractor Agreement

At trial, Plaintiff introduced the agreement between the Parties that initiated their working relationship.  That agreement is titled "Independent Contractor & Non-Compete Agreement."[10]  (Pl. Ex. 2).  When asked about that document, Plaintiff testified:

> Q: On the date [that you signed the agreement] did you specifically discuss with Mr. Mola that you would be an independent contractor?
>
> A: Yes.

(Tr. (Aug. 2, 2016)).  Plaintiff went on to testify that he had been hired as a driver in an independent contractor capacity before and well understood what that status meant. These unambiguous responses—in conjunction with Plaintiff's testimony regarding his understanding of the terms of the agreement and the manner in which his work was performed—provide helpful context for the facts adduced at trial, and shed light on Plaintiff's understanding of the "economic reality" of his relationship with Defendants.

## 2.  Plaintiff's Tax Returns

Plaintiff's tax returns, introduced by Defendants, similarly evidence that Plaintiff understood himself to be—and was, in fact, treated as—an independent contractor. (Def. Ex. A, B, C).  As was the case at his deposition, when asked about his tax returns at trial, Plaintiff studiedly evaded the questions posed by defense counsel and referred all inquiries about the manner in which his taxes were prepared to his accountant.  *See* Section II(B)(i) and II(B)(III)(c), *supra*.  Still, the tax returns about which defense counsel

---

[10] As the Court acknowledged at summary judgment, the labels of the parties are not conclusive in determining Plaintiff's status.  Still, the Court finds that the perception of the Parties— particularly Plaintiff—is informative in evaluating the true "economic reality" of the relationship at issue.

inquired are undeniably consistent with Plaintiff filing his taxes as an independent contractor, but not as an employee:

> Q: On your tax return schedule SE there is a self-employment tax which you indicate $1,033. [Is there a] reason why, if you believe you are an employee, you would be paying self-employment taxes sir?
>
> A: I repeat I do not know anything about the taxes. I do not prepare them.
>
>                  * * *
>
> Q: [O]n [li]ne 15 of your tax return for 2012 sir there is an entry for insurance other than health $2,370 would that be the expense for insuring your vehicle sir?
>
> A: Insurance for my vehicle. I found the evidence, but I was not allowed to bring it.

(Tr. (Aug. 2, 2016)). After a number of exchanges like the ones above and a stern warning from the Court, Plaintiff ultimately relented and acknowledged that he prepared and filed his taxes as an independent contractor while working for Defendants:

> Q: . . . I asked you earlier if it was your understanding as an independent contractor you were able to deduct all these expenses or whether could deduct them as an employee.
>
> A: As an independent contractor.
>
>                  * * *
>
> Q: So you were, in fact, filing your tax returns as a person in business for yourself?
>
> A: Correct.

(Tr. (Aug. 2, 2016)). Plaintiff cannot evade the implications of his tax returns by claiming that he was unaware of the manner in which they were prepared, especially in light of these statements. Additionally, Plaintiff's later testimony made clear that he fully

understood the difference between the manner in which he was paid and the tax forms

provided to him when working as an independent contractor versus an employee:

> Q: Did Alex Mola discuss with you how you would treat your payments as far as taxes are concerned?
>
> A: Well, I knew that—from being an independent contractor he had to provide me with the papers so that I would have my taxes done.
>
> Q: Did Mr. Mola deduct taxes from your payments sir?
>
> A: Never.
>
> Q: He didn't deduct taxes in 2012 or 13 or 14?
>
> A: No.
>
> Q: Did Mr. Mola in fact give you a 1099 at the end of the year you worked?
>
> A: That's correct.
>
> * * *
>
> Q: Okay. So what is your understanding of the difference between being an employee and an independent contractor as far as these [tax] deductions go?
>
> A: As to the deductions companies deduct these to their employees for taxes.

(Tr. (Aug. 2, 2016)).

Finally, as discussed in more detail below, the tax returns indicate that Plaintiff

had income beyond the income earned from Now Courier, which substantially

undermines his repeated averments that he was not permitted to work for anyone else:

> Q: So your accountant prepared a profit or loss for a sole proprietor for you which indicates $31,483 in gross receipts. Is that the total income you made for 2012?
>
> A: If it says that there it has to be that.

> Q: Since, Mr. Bonet, Mr. Mola only paid you $26,101.65 where was the rest of the money earned?
>
> A: Look them up in the taxes they have to be there.
>
> Q: So there is no evidence of where you earned the additional money that is indicated on your tax return?
>
> A: There has to be because my accountant is not going to include an amount of money I do not have.

*Id.*

### 3. Plaintiff's Bank Records

Plaintiff's bank records, which were also introduced into evidence at trial, similarly cut against Plaintiff's contention that he was an employee.  (Def. Ex. D, E). When asked at trial whether he was able to work for anyone else while working for Defendants, Plaintiff stated that he could not, and therefore was economically dependent on Defendants.  Yet Plaintiff's bank records, as elicited at trial, contain multiple deposits totaling over $45,000 in 2013, despite the fact that Plaintiff stated at trial that (1) he only earned $21,000 in 2013 from Now Courier and (2) he deposited "almost none" of the Now Courier payment checks into his account.  (Tr. (Aug. 2, 2016)).  As was the case at his deposition, when asked about certain deposits at trial, Plaintiff was unable to explain where this money came from:

> Q: Mr. Bonet I am going to ask you specifically about some deposits you made in 2013. In January your first deposit was $250 on January 7th. Is that money you earned from Now Courier?
>
> A: Possibly.
>
> Q: There was another deposit for . . . $300 on January 22nd. Is that another deposit you made from Now Courier?
>
> A: Possibly.

Q: According to the record sir you were paid on March 5th, $1017 by Now Courier. Did you deposit that money?

A: I don't remember.

Q: The next payment Now Courier made was March 18th another $1,063. Did you deposit that money?

A: I don't remember.

Q: According to your bank statements you deposited $ 2,362.60 on March 14th of 2013 with Now Courier not giving you any money. Where did that money come from?

A: I don't remember.

(Tr. (Aug. 2, 2016)).

### b. Plaintiff's Testimony at Trial

In addition to the evidence introduced at trial, Plaintiff himself testified about the many aspects of his role at Now Courier that were consistent with him being an independent contractor and evidenced his understanding that he was, in fact, hired as an independent contractor by Defendants.  For example, after testifying that (1) he agreed his compensation for his work with Now Courier was "70 percent of the trips plus the extras;" (2) he paid his own truck insurance and claimed the same on his taxes; (3) he paid for his own gasoline for his trips on behalf of the Defendants; and (4) he had to have his own vehicle to work for defendants, Plaintiff went on to explain:

Q: Now Mr. Bonet what is your understanding of what it is to be an independent contractor?

A: Everything that we have spoken of here: the insurance itself, to pay for the gasoline, receive 70 percent of all the trips, plus the extras.

Q: Sir, . . . I am asking what it was that you walked away from [the meeting with Alexander Mola] with your

> understanding of what it meant to be an independent contractor?
>
> A: To be an independent contractor is to get 70 percent of all trips plus the extras.  And I repeat everything that has been said before: to have your own van, to have your own insurance, to pay for the gasoline. I remind you once again that it was not the first time that I worked as an independent contractor.

(Tr. (Aug. 2, 2016)).

Additionally, as noted by the Court on the record at trial, the only testimony given by Plaintiff regarding his discussions with Defendant Mola about being an employee were those where Plaintiff asked to be an employee and Defendant Mola declined his request:

> Q: And you have ever complained about being an independent contractor to Alex Mola?
>
> A: Yes several times I asked him—for him to pay me a fixed salary per week.
>
> Q: And when did you first ask him that?
>
> A: It must have been around 2013 because he really paid me very badly.

(Tr. (Aug. 2, 2016)).

In stark contrast with the evidence described above, the only evidence adduced at trial that supports Plaintiff's contention that he was an employee were his conclusory statements about his work for Defendants—he testified that he didn't think he was an independent contractor "[b]ecause I could not have another job, I could not work for other people. I depended fully on the company, I could not choose work. And I had to spend the time he would indicate to me to be with the company day by day."  (Tr. (Aug. 2, 2016)).

28

The Court finds that this testimony is insufficient to create a legitimate legal basis for concluding that Plaintiff was an employee of Defendants.   Plaintiff's repeated assertion that he wanted to be an employee cannot overcome the overwhelming evidence—supported by all of the facts adduced at trial—that indicate he was an independent contractor not covered by the FLSA's overtime provisions.   Accordingly, the Court finds that no reasonable jury could conclude that this testimony sufficiently established that Plaintiff was an employee while working for Now Courier.

### C. Absence of proof on damages

The Court also notes that Plaintiff adduced no evidence at trial to support the central tenet of his overtime claim, namely Plaintiff's contention that he worked more than 40 hours per week while working as a driver for Defendants.   Even Plaintiff's own testimony on this issue failed to form an adequate basis for this element of his claim:

> Q: You claimed you worked 60 hours were there ever weeks you could have worked less?
>
> A: Yes that too. That is true, yes.
>
> Q: Could there ever have been a week up worked under 40?
>
> A: Yes that too.
>
> Q: Were there ever days there was not any business?
>
> A: There were several times when Alex did not give me work.
>
> Q: Approximately how often?
>
> A: That was not often it was very little, but there were occasions it did happen.
>
> Q: What about when your van was broken?
>
> A: I had no work -- only expenses.

> Q: And were there any weeks you worked more than 60 hours?
>
> A: Possibly.

(Tr. (Aug. 2, 2016)).  There is a similar dearth of evidence regarding the minimum wage value that should be assigned in computing the amount of overtime due.  When asked at trial, counsel for Plaintiff was unable to articulate any mathematical basis to calculate unpaid overtime wages.  Thus, even if the Plaintiff had put forth sufficient evidence to prove that he was a covered employee under the FLSA and the jury had rendered a verdict in his favor, the profit-sharing arrangement to which Plaintiff and Defendants agreed would leave the Court with no logically sound, factually grounded, or legally cognizable means of calculating damages.[11]

## II. CONCLUSION

For the reasons stated above and by the Court at trial on August 3, 2016, it is **ORDERED AND ADJUDGED** that Defendants' *ore tenus* motions for dismissal as a sanction under Rule 41 Federal Rules of Civil Procedure and for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure are **GRANTED**.

---

[11] As noted in the Court's order on summary Judgment, this issue relating to the damages calculation has been problematic since Plaintiff filed his complaint.  (*See* DE 75 at 5 ("No explanation was given as to why Plaintiff used different methods for calculating his hourly rate for the two periods [of his employment with Defendants], and Plaintiff did not (nor has he ever) disclose the manner in which he calculated those damages or make the documents upon which his calculations are presumably based available for inspection and copying.")).

**DONE AND ORDERED** in chambers in Miami, Florida, this _____ day of August

2016.


KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE